MONCURE, J.
This is an appeal from-a sentence of the Circuit court of Accomack, admitting to probat two testamentary writings purporting to be the will and codicil of Thomas T.. Taylor. They were propounded by his son Edward W. Ta3-lor the appellee, who is the principal devisee and legatee, and named executor; and were contested by his daughter Sarah A. Parramore the appellant, and her husband Thomas H. Parramore, who is since dead; the said son and daughter being the testator’s only children and heirs at law. They were contested on the grounds of, first, incapacity; secondly', undue influence; and thirdly, defective execution.
The case was first tried by a jury; but it was unable to agree, and was discharged. Aftei'wards it was agreed to submit the whole case, upon the law and the evidence, to the court, from whose sentence either party might appeal; and that in the event of an appeal, it should be specially certified to the Court of appeals, that the judge sitting on the trial of the issue heard, and was present at the examination of, all the evidence in the cause. The court decided to admit the will and codicil to probat, with the exception of a part of the codicil considered by the court to have been improperly inserted therein. The examinations of the witnesses and the documentary evidence were certified as the facts proved on the, trial, and were *ordered to be made a part of the record in the cause. The whole case is now before this court for revision of the sentence of the Circuit court thereon.
I will consider the grounds of opposition to the probat in the order above stated. But it seems to be proper in the first place, to enquire, whether the testimony of James S. Corbin is to be regarded as credible. He is by far the most important witness in this cause; and if his testimony is to be believed, it conclusively settles at least two of the three questions arising in the case. He was the scrivener who wrote both the will and the codicil, as well as a prior will; was present at the execution and acknowledgment of all of them, and was a subscribing witness to all. It was of vital consequence to the contestant, therefore, to overthrow, if possible, the testimony of this witness; and an attempt was accordingly made to do so; or to weaken the force of the testimon3r as much as possible. The means mainly used for that purpose was a very long- and close cross examination. No witness was introduced, no question asked, to impeach his general character for veracity or otherwise. The only evidence offered tending in any way to discredit him was that of Mrs. Young, a cousin of Mrs. Parramore, and it would seem, a sister of her husband Thomas H. Parramore. She testified that when the witness Corbin was formerly in attendance at court to prove the will and codicil, he dined with her husband Dr. Young; and in a conversation between them on the subject, Corbin, in answer to a question of the doctor, whether the testator had to reflect in disposing of his property, said 1 ‘No, he recited or read it off as a school boy would a lesson ; he (Corbin) said his brain was such that any impression might be made upon it.” It is remarkable that her husband, who was also examined as a witness, and in answer to whose question the alleged statement of Corbin was *made, did not remember it. The recollection of Mrs. Young as to the other circumstances of the visit and conversation was very indistinct. She said she did not know why the words of Corbin before stated made so strong an impression on her mind, unless it -was confirming her in what she thought before, that her uncle was child-like. She admitted that Mrs. Parramore was a favorite cousin, and that she wished the will overthrown, because she thought, if left to himself, her uncle would never have made such a will. I have no idea that Mrs. Young, in giving her evidence, said an3rthing that she did not beliei’e to be true. But I think she was insensibly influenced by feelings of partiality, and misunderstood, or misconstrued, or did not rightly remember, the words of Corbin. The words, as stated by her, would have been in direct conflict -with his sworn testimony given in court on the same day, and which seems to be substantially the same with his subsequent testimony in the case. Though subjected to the test of *109 a close cross examination, his testimonj' is consistent in itself, and materially variant from none of the other testimony in the case. His intelligence appears from his evidence, and his general character for veracity is strongly sustained bjT several witnesses who have long known him, and whose testimony appears to be entitled to much weight. He ought, therefore, to be regarded as a Iruthful witness in the decision of this cause. I will now proceed to .consider the grounds of opposition to the probat. And
First, as to the alleged incapacity of the testator.
The testator appears to have been a man of good common sense, and to have been prudent and careful in the management of his affairs. He was about seventy-five years of age when he died, and for some time previous to his death had been in the habit of drinking freely, and perhaps many times to excess. It is not pretended, however, that he was incapacitated by the ordinary *effects of old age, or drunkenness ; or that he was under the influence of ardent spirit, or any other kind of stimulant, at the time of the execution of the will or the codicil. The only ground of the alleged incapacity relied ou is, that for a few months before his death, and until his death, he was supposed to be affected by a disease of the brain, which produced occasional convulsions and partial paratysis, and that two of these convulsions or Jits actually occurred while he was engaged in dictating the will to the scrivener. The commencement of the disease appears to have been early in June 1851. The will was executed and acknowledged on the 24th of that month, the codicil on the 7th of September thereafter, and the testator died on the 29th of the latter month. Dr. Joynes, a witness apparently of great intelligence, skill and scientific information, attended him during his last illness, and gives a minute account of the disease, and of the condition of the patient during his several visits; which were ou the 17th and 19th of June, on the 29th and 31st of August, and on the 4th of September 1851. The disease with which he believed the patient was affected was “softening of some part of the left side of the brain. ” And the account which he gives of its nature and effects is as follows: “That disease is a softening, that is to sa3r, a diminution of consistence of one or more parts of the brain, generally limited in extent, varying generally from the size of a pea to that of an orange: in a few cases affecting an entire half of the brain, rarely if ever the whole of it. It makes its attack in a variety of forms; sometimes the S3rmptoms are very much those of ordinary apoplexy; the patient falling senseless and motionless, and dying in a few hours; in some instances, after the disease has commenced in this way, the patient, after a time, recovers his senses, but remains palsied in one or more limbs, with frequently *more or less impairment of mind. In another class of cases, the disease begins with symptoms of inflammation of the brain, there being headache, fever, delirium, sometimes partial, convulsive movements, frequently with rigid contraction of one or more limbs, which is generally followed by palsy of the same limbs. In numerous cases, the approach of the disease is more gradual, the patient, perhaps, after suffering for a time with headache and giddiness, experiences some unusual sensation in one or both limbs of one side of the body, such as pain, tingling, Sec. After a time the power of movement and the faculty of sensation in those limbs become impaired; this impairment increases until a total paralysis of those parts is the effect: partial convulsions ma3r or may not precede or alternate with this palsy; sometimes in the beginning of such cases there is a gradual impairment of the mental faculties—though in many instances they remain unaffected until the last moments or hours of life. It must be understood that the foregoing is a very general account of some of the leading forms of the disease, and that the symptoms themselves and their order of succession vary a good deal in different cases. Its usual termination is in death ; though the interval between the first attack and death may vary from a few hours to several years. “If the disease be limited to a small portion of the brain, I believe that it may continue for a considerable time without destroying the testamentary capacity of the individual.” Being asked by the contestant in the cross examination, “Do you refer the disease of the testator to that class attended with inflammation and delirium, or to that in which there is no inflammation attending the softening of the brain?” the doctor answered, “I refer his case to that in which there is no inflammation.” And in answer to another question of the contestant, he said, ‘T believe that softening of the brain *may, without producing disorder of the intellect, produce a weakening of the will; an impairment of steady purpose; and a liability to be influenced by others. I also believe it possible that such disease might produce a perversion of the ordinary affections and dispositions.”
In regard to the condition of the testator at the several visits, the doctor says that at his first visit, which was on the 17th of June, “The principal circumstance which attracted my attention was the occurrence of convulsions affecting the right half of his body at intervals. These convulsions continued for a minute or less at each return, and were followed by partial palsy of the right limbs and of the tongue; and this palsy gradually passed off in the intervals of the convulsions; so that before the return of the convulsion he had perfect use of all the limbs and of the tongue. A minute or two after the cessation of the Jit, he would utter the word ‘basket’ two or three times, somewhat indistinctly, and then begin to talk, at first rather thickly, and afterwards with sufficient distinctness. In fact, after some time, his speech was *110 entirely distinct and unaffected. The left side of his body seemed to' be entirely unaffected either by the convulsions or by the temporary palsy which followed them. He complained of some feeling of fullness about the head, but I do not recollect that he complained of pain.”—“I cannot speak with precision as to the intervals between the fits; but I would say, in general terms, that it was about an hour, more or less, while I saw him. As to the regularity of their return and duration, I am unable to speak, because he had only two, or at most, three fits during my first visit. The duration of each fit in which I saw him seemed to be about the same.”—“As to the state of his mind during these convulsions, I know nothing; after a convulsion had passed off, and the faculty of speech returned, his mind seemed clear.”
*In the perfect intervals of the fits he communicated with the doctor as a sane and intelligent patient. The doctor was with him, on this visit, about three hours and a half, and does not think there was more than a quarter of an hour of the time in which his mind was not apparently clear. The next visit was on the night of the 19th of June, just five days before the execution of the will. “At that time (says the doctor), the 'convulsions had ceased; the palsy had disappeared, and the other symptoms, which I have previously mentioned, were less marked; he seemed much better in all respects.”—“I next saw him on,the night of the 29th of August about 10 or 11 o’clock; he was then laboring under a palsy, complete or nearly so, of the parts which had been affected at my first visit, except the tongue, which was only partially paralyzed, leaving his articulation, although somewhat thick and difficult, yet easily understood.”—“The palsy, during the visit of which I speak, was permanent; it was neither absent nor diminished at any time during my visit, as far as I recollect. His mind was clear. I detected no delirium, incoherence, or other manifest disorder of the intellect. There was no convulsion during this visit, which lasted until shortly after sunrise next morning. I was in the room with Mr. Taylor some two or three hours of this time.” The next visit was on the 31st of August; “hisphysical symptoms were much the same as at the visit of the 29th of August; nor do I think the state of his mind was materially different.”— “.He had no convulsions at this time.”— “My next and last visit was on the 4th of September, about 11 or 12 o’clock in the morning; it continued probably two hours. At this time the tongue was much more affected by the palsy than at my two preceding visits. I experienced much difficulty in conversing with him. I was sometimes obliged to repeat a question two or three times before a clear answer could be obtained; and sometimes it *required the assistance of persons standing around the bed to enable me fully to understand what he said. In other respects, I recollect nothing particular to be noted in reference to his physical condition as differing from what it was at my previous visit. As it respects the state of his mind, I am not able to speak with as much confidence as at previous visits, because, owing to the great 'difficulty of speech, I conversed with him but little, and obtained most of the information, which I desired in regard to his condition, since my last visit, from members of the family. So far as I conversed with him, his answers were rational. Another reason why I held but little conversation with him was, that he seemed but little disposed to talk. He appeared low spirited and somewhat fretful and irritable, and disposed to find fault with persons in the room if every attention was not promptly bestowed; he was also quite restless, requiring to be frequently' lifted, up and down.” This visit was three days before the execution of the codicil.
Dr. West was the family physician of the testator at the time of his death ; attended him during his last illness; thinks his mental condition was good about the period of the date of the will; thought he conversed as rationally as ever; saw no reason to doubt his capacity to transact ordinary business, and of disposing of his property in any way'; thought he was capable of transacting his own business, such as paying and receiving debts, settling accounts, and giving and taking receipts up to the last time he visited him, which was about a week before his death; and of course about a fortnight after the date of the codicil.
I have stated thus fully the evidence of the attending physicians, because it is entitled to great and peculiar weight in determining the question now under consideration. On this subject see the opinion of Carr, J., in Burton v. Scott, 3 Rand. 399, 403.
James S. Corbin, the draftsman of the will and codicil, *had always known the testator; was well acquainted with him for the last thirty years of his life; lived within three or four miles of him for the last twenty years; and was intimate with him the larger portion of the time; thinks that at the time of making his will and codicil he was as capable or competent mentally to make a will as at any previous time. The facts stated by this witness fully sustain his opinion of the capacity of the testator. He says, “I wrote two wills for the testator; this in court is the second. At the time I wrote the first will, he had before him his bonds and notes and a copy of his wife’s will. After reading over the copy of his wife’s will attentively, he remarked to me that he had promised his wife to make up his daughter’s portion of land equal to his son’s; but he believed she had already as many acres as he (Edward) had. I replied, ‘yes; but her land, a large portion, was not worth more than four or five dollars an acre, and Edward’s, a portion of it, worth from twenty to thirty dollars an acre.’ Here he used a slight exclamation, what I do not *111 recollect. He then proceeded to add up the amount of his bonds and notes; after doing this, he said, with a long sigh, or breath, or something of the kind, ‘X will make a will to please them, but, I expect there will be a squabble over it.’ This was the time of making the first will. Some ten or twelve days after this I was again sent for to go down to his house, and he told me he wished to make some alterations in his will. I asked him if it would not be better to destroy the first will and make a new one. He answered that he thought it would. He then directed me to destroy the old will, which I did, and he took his seat at the table and dictated the will now in court, which I wrote for him. During the time I was writing the will, and just before, he had an attack of paralysis or palsy, or whatever you may call it; he said he was *like some old man, whose name he mentioned, who made a will and gave all his property to himself, and said he thought too much of his property to give it to any person while living. He had, I think, while writing the last will, two short attacks of paralysis, but appeared to me perfectly rational as soon as he could speak, and would commence dictating as soon as he could speak, with as much composure as he did before he was struck.”
The witness was engaged two hours or more in preparing the will, and after finishing it, read it carefully and slowly to the testator, who said, “Well, that will do,” or words to that amount. It was then signed by the testator, and attested by two witnesses; after which, the testator handed it to his son Edward, and told him to put it away. At sometime between the writing of the will and the codicil, Edward W. Taylor told the witness he had shown the will to Mr. Eisher, a lawyer, who thought it was not explicit enough in regard to the bonds and notes, and said that his father wished to make a codicil to explain the nature of those gifts. Witness replied, that he would write it, if the testator requested it. Afterwards, the witness having been sent for by Edward W. Taylor, went to the house of the testator for the purpose of writing the codicil. After he had been there some short time, Edward W. Taylor said, “Eather, Captain Corbin is here, and if jrou wish to make a codicil to your will, he will write it for you.” The testator replied, “let it alone till morning.”—“Some time after this (says the witness), when all or nearly all the other persons who were present had retired to bed, I suppose, and when there were no persons present except the testator and myself, and perhaps Mr. Robert J. Silverlhorn (one of the witnesses to the codicil), the testator said to me, ‘Edward wants me to make him executor alone, and to explain about the property given to him. ’ I replied, *‘ well and he went on to say, ‘I intended to give him all the balance of my property which I had not given away before.’ I said to him, ‘Did you intend to give him all the negroes or not?’ And he said ‘yes, everj'thing except what I had given avray before.’ I may have mentioned to him the bonds and notes, but do not recollect every particular word or words that were passed between us that evening.”
The witness Corbin and Robert J. Silver-thorn staid there that night. Next morning Edward W. Taylor came into the bed room of the witness, and said that his father then wished him to go down and write the codicil to his will. The testator war, lying in bed, and witness wrote the codicil at a window not more than eight or ten feet from the bed. Testator did not redictate to witness what he said the over night, except in one general expression, which was, “Write what I told you last night.” Witness wrote the codicil according to what he understood from testator the night before, except the following clause: “He also states that the loan of a plantation to his daughter Mrs. Sarah A. Parramore was intended as a consideration for her thirds in a plantation called Poplar Grove, now owned and occupied by David Taylor, which interest the said Sarah A. Parramore and Thomas H. Parramore are to convey to David Taylor, and in case of failure, to forfeit an interest in this will to that amount.” In regard to this, the witness says the testator “did not dictate il to me. I think I received it from Mr. Edward W. Taylor, who was standing at his bed-side, and to whom I supposed at that time the testator had communicated it; but when I read the codicil to the testator, he objecied to that clause, and said it ought not to have been put there; that he Major Taylor would send for Mr. and Mrs. Parramore, and have that matter settled. I offered readily to strike out the clause from the codicil, and left the bed-side where he *was. where I had been standing reading, and walked towards the window with the intention of striking it out, but remarked that if they did convey, that clause would be of no force. He Major Taylor replied, let it alone until they come. Consequently, I did not strike it out. ” When witness was writing the codicil he and testaior could distinctly hear each other in a common tone of voice. Does not know where Edward was during the larger portion of the time ; thinks he had been out of the room a part of the time. When he spoke to witness about the clause in relation to Mrs. Parramore, he was much nearer the testator than witness was, and much nearer to testator than to witness. His position then, as witness thinks, was casual or accidental. Witness did not hear testator dictate the clause in question to Edward, and does not suppose that he dictated it at that time, at all events. Edward said to witness, “Eather wants you to put in a clause to compel sister to convey her thirds in Poplar Grove. ” The peculiar phraseology of the codicil In this respect was that of the witness. Has no doubt that Edward was distinctly heard by the testator, who made no objection at the moment, or before the clause was written. The codicil was read over to the testator *112 after it was written, witness thinks twice; once before the objection was made, and once afterwards. And it was then executed by the testator, and attested by two of the witnesses. Hr. and Mrs. Parramore were then sent for. They came over very soon after, and witness says, “I think three deeds were shown or handed to them by Mr. Edward Taylor. One of the deeds, I think, was written by Mr. Eisher, (I mean the counsel). I think this deed was intended to be given from Thomas T. Taylor to David C. Taylor. The other two were for the conveyance of Mrs. Parramore’s thirds in the plantation called Poplar Grove. The one, I think, was written by Mr. Edward *W. Taylor, and the other, X think, looked very much like the handwriting of Thomas H. Parramore. They (Mr. Parramore and wife) did not convey, telling Thomas T. Taylor that he was too sick to attend to business. He replied with warmil, looking at Mr. Parramore rather sternly, ‘Whatdo you mean?’ Mr. Parramore replied that he only meant to say that he, Major Taylor, was too sick to attend to business. And I was not called on afterwards to strike out the clause.” The deeds were handed to Mr. and Mrs. Parramore in testator’s presence, and witness thinks, at his request; and testator said to them, “I wish you to fix this business.” The testator had no convulsion when the codicil was written. One side of him, witness says, was completely paralyzed, and it was with much difficulty he could articulate his words. There were many words that he would attempt to articulate, and the persons present were compelled to pronounce them for him. He could articulate many words almost distinctly, and most of the words sufficiently to be understood by any person of common understanding.
The foregoing seem to be substantially the testimony of this important witness, so far at least as it affects the question of capacity. His examination was very much protracted, and he was made to repeat the same thing several times. I have endeavored to give his statement of the material facts, in their proper sequence. I think they fully sustain his opinion of the capacity of the testator, both at the time of making his will and his codicil. That opinion is also sustained by the evidence of the other attesting witnesses, and a great deal of other evidence in the case, which it is unnecessary to detail. No witness, I believe, expresses the opinion that the testator’s mind was at any time unsound, except on the day of his death. No fact is proved from which unsoundness of mind at any prior time can be fairly inferred. Thé disease of which he *died, while it paralyzed one-half of his body and impaired his speech, seems to have had little or no effect upon his mind. I am of opinion, therefore, that he had sufficient capacity to make the will and codicil.
Secondly. As to the alleged undue influence exercised upon him by his son Edward W. Taylor.
The only material evidence on this subject, X believe, is to be found in the testimony of the witness Corbin, before stated; and in the fact that at the time of the testator’s death, and for several years before, Edward W. Taylor and his wife and child or children lived with him, and seem to have constituted his family. Mr. Corbin was a connection and near neighbor of the testator, and very intimate with him; and doubtless had as good an opportunity as any other person of knowing whether such undue influence existed or not. He says, “I know of nothing of the kind, of m3' own personal knowledge. I have never seen anything of the kind, and have no reason to believe there was, from any circumstance or occurrence coming under my own immediate knowledge or observation.” Being asked, ‘ ‘Was there not a very long, strong and uninterrupted relation of affection between the testator and his only son Edward W. Taylor?” he answered, “I verily believe there was.” And being further asked, “Did not that.son fear and reverence that father, and did he not always obey him to the day of his death?” he answered, “X believe he did.” Mrs. Young, a sister, it appears, of Mr. Parramore, and niece of the testator, had also no doubt a good opportunity of knowing whether such influence existed or not. When asked, in cross examination, “Do you know of any fact of undue or improper influence, either by fraud or force, which caused Thomas T. Taylor to make this will,” she answered, “No, sir, I do not.” In regard to the will, there is nothing in the record from which it can be inferred that he had any *agency in causing the testator to make it or to adopt any of its provisions. The testator seemed to be anxious to make his will, and twice requested that Mr. Cor-bin should be sent for. It does not appear that Edward W. Taylor knew what would be the contents of the will until after it was written, but rather the contraoq as he expressed something like surprise at some of its provisions. By the will the testator lends the land to his son for life, and gives it to his heirs at his death. He remarked to the draftsman of the will that Edward was not.to be trusted with a large estate; that he would lend it to him, and then give it to his children. Edward was not present when the will was written, he and the witness Bloxom having been sent out of the room by the testator. It does not appear that there was a great deal of difference between the two wills which Corbin prepared ; nor which, upon the whole, was more favorable to Edward, though it seems probable the first was.
In regard to the course of Edward in showing the will to counsel, Corbin, when first requested by the testator to write his will had said, “You have a large estate; why do you not send for a law3'er, and have 3'our will written in proper form?” To which the testator replied, “You can write one now, and if I get better, I can do so.” There can be no doubt of the intention of *113 the testator to include his negroes and the balance of his bonds and notes, after paying hik debts and legacies, in the residue of his property given by his will to Edward. Corbin says, that after he had written all but the last clause of the will, the testator remarked, ‘! Give a 11 the residue to Edward. ’ ’ Corbin enquired, “Do you intend to give 3’our son Edward all your negroes?” He replied, “Yes, they are worth nothing; give them to Edward.” Corbin then wrote the last clause; and read the will slowly to the testator, who expressed his satisfaction with, and executed *it. The wotjds of the clause would no doubt be construed according to the intention of the testator. The residue is described as ‘ ‘consisting of negroes, household furniture, and stock of horses, cattle, sheep, &c. ” The balance of the bonds <md notes was probably not particularly mentioned, because it was supposed the amount would be small, after paying debts and legacies. The will was placed by the testator in the custody of Edward; and it is not improbable that it was shown by the latter to a lawyer at the former’s request, in pursuance of the suggestion of Corbin and the purpose indicated to him by the testator, as before stated. But even if shown to a lawyer by Edward of his own accord, I see nothing in the fact from which fraud can be inferred, or which can be of much if any importance as a link in the chain of circumstances relied on to prove the fraud. The contents of the will were not intended by the testator to be concealed from Edward. It was handed to him open or unsealed. He knew his father’s intention, but did not know that it was so clearly expressed in the will as to be free from doubt. He may, therefore, of his own accord, have shown it to- a lawyer; and when advised that the residuary clause was not sufficiently explicit, he naturally' desired that it should be explained by a codicil, so that there might be no room for future controversy. The codicil, then, gave him nothing that was not given, or intended to be given, him by the will. Its main object was to remove all room for doubt in regard to the meaning of the will. It nominates Edward sole executor, the will having made him coexecutor with W. Parramore. That matter was first mentioned to Corbin by the testator, who said, “Edward wants me to make him executor alone, and to explain about the property given to him.” Having given Edward the largest portion of his estate, made him residuary legatee, and directed him to pay' his *debts, it seemed to be fit that Edward should be sole executor, and he naturally desired to be so. The circumstance in the case which most materially affects the propriety of the conduct of Edward W. Taylor in regard to the will and codicil, is his connection with the insertion in the codicil of the clause in relation to Poplar Grove. It seems there had been an agreement between the testator and Parramore and wife, that the latter would release to the former Mrs. Parramore’s dower interest in Poplar Grove, containing three hundred acres, in consideration that the former would convey to the latter another trad of three hundred acres. Accordingly, the testa lor had conveyed the former tract to David C. Taylor, and the latter to Parramore and wife, whom he desired to release her interest in the former to him ; and a deed was prepared to be executed by them, which, with the other two conveyances, were the deeds before mentioned as having been handed to them on the day of the execution of the codicil. The testator and his son were both interested and anxious to have the deed executed by Parramore and wife; who, for some cause not disclosed by the record, were unwilling, or had fathed, to execute the deed. It is probable they had had some conversation on the subject of putting something in the codicil to compel Parramore and wife to make the deed. The testator must have heard his son, standing by his bed-side, say to Corbin who was drawing the codicil, “Eather wants you to put in a clause to compel sister to convey her thirds in Poplar Grove,” and by his sthence he assented to what was said. It is true that when the codicil was read to him he objected to that clause, and said it ought not to have been put there, and that he would send for Mr. and Mrs. Parramore, and have that matter settled. The ground of his objection does not appear. It may have been the phraseology of the clause, which was that of the draftsman. He determined, however, after the effect of it had been explained by Cor-bin, to let it remain as part of his codicil.
The tract of land loaned to Mrs. Parramore for life by the will, seems to he the same land conveyed to her and her husband for life in consideration of her interest in Poplar Grove. In both the will and deed the land is described as occupied by Thomas "Only. When the testator made his will he told Corbin that he loaned this land to Mrs. Parramore, in consideration of her thirds in Poplar Grove. When Corbin wrole the clause in the codicil, he wrote nothing more than what the testator had previously informed him was his actual intention, and what he had, under all the circumstances, every reason to believe the testator then wished to be embodied in his codicil. The testator would have preferred having the matter in regard to the release settled in his life time; but failing in that, seems to have been willing to settle it by his will. I cannot, therefore, see in this circumstance, taken by itself, or in connection with all the other circumstances, sufficient ground for condemning the will and codicil, or either, as having been obtained by' fraud or undue influence. The testator certainly made by his will a very unequal distribution of his property between his two children, and the record does not disclose any' better reason for his haying done so than that it was his will; which is an all-sufficient reason with courts of justice, however they may admire the rule of equality. The violation of that rule, without *114 apparent good cause, may put them on the alert, and cause them to scrutinize the testamentary act with greater care. But being satisfied that it is the act of a competent testator, free from the undue influence of another, they are bound to give it full effect. Judge Carr has made some appropriate observations on this subject in Boyd v. Cook’s ex’or, &c., 3 Leigh, 32, 50, 51, *which I will not repeat. It is not uncommon for fathers to prefer their sons to their daughters; especially when they come to make their wills. The testator manifested such a preference otherwise than in making his will. He seems to have supposed too, that in giving property to his daughter he was giving it to her husband. Another circumstance which may have operated upon him was that he had been the guardian of her husband, who had sued him for a settlement of his guardianship account; though this circumstance does not appear to have produced any ill feeling between them; or if it did, the wound appears to have been healed before his death. But it is needless further to en-quire about his motive for the preference. The nature of the disease under which the testator labored at the time of the testamentary act is another circumstance which requires of the court of probat the greatest possible care in determining whether or not the act was the offspring of a sound mind, free from undue influence of others. I have endeavored to give due weight to all these circumstances in coming to my conclusions on the subject; and I am of opinion, not only that the testator’s mind was sound when the act was done, as I have already said, but that it does not appear that any undue influence was exercised upon him by his son to induce him to execute the act, or any part of it. ‘ ‘The influence to vitiate an act (says a writer of high reputation), must amount to force and coercion destroy-* ing free agency; it must not be the influence of affection and attachment; it must not be the mere desire of gratifying the wishes of another; for that would be a very strong ground in support of a testamentary act; further there must be proof that the act was obtained by this coercion; by importunity which could not be resisted; -that it was done merely for the sake of peace; so that the motive was tantamount to force and fear. ” 1 Williams on Ex’ors, p. 39; 1 Jarm. on Wills, p. 29, note 1.
*The opinion I have expressed on the two questions I have been considering is greatly strengthened by the fact that it accords with that of the Circuit court; except so far as relates to a portion of the codicil to which I will again advert. The weight to which the opinion of the court which saw and heard the witnesses is entitled in such cases, is shown by the cases of Dudleys v. Dudleys, 3 Leigh 436; Jesse v. Parker, 6 Gratt. 57; Nock v. Nock’s ex’ors, 10 Gratt. 106, 111.
Thirdly. As to the ground of defective execution.
And 1st, as to the will. Corbin was sent for in the night, and requested by the testator to write his will. It was probably written between eleven or twelve, and one or two o’clock that night; the draftsman being engaged about two hours in writing-it. The table and writing materials were brought by the direction of the testator, who then requested his son and Bloxom (one of the attesting witnesses) to step out of the room a little while. They accordingly went out, and the door was shut. The will was then written by Corbin, read to and approved bj' the testator, who signed it in Corbin’s presence, and requested him to witness it; which he accordingly did, by subscribing it in the presence of the testator. Corbin says, “After witnessing the will myself, he (the testator) said, ‘call in Mr. Bloxom and get him to witness it too,’ or words to this amount. I left the will on the table, and opened the door of the room with the intention of going after Mr. Bloxom myself; but I think I saw some of the family in the passage, and requested them to call Mr. Bloxom in. Immediately afterwards Mr. Bloxom came into the room, and the testator said to Mr. Bloxom, as I now think, either ‘here, or there is my will,’ I want you to witness it; and he, Mr. Bloxlom, did witness it in my presence. Mr. Bloxom soon after this, either ordered, or requested Mr. Taylor to order his horse and carriage, and he and his wife left for home. Major Taylor then handed the will to his son Edward W. *Taylor, and directed him to put it away. I had before this folded up the will and handed it to the testator. Mr. Edward Taylor took the will, and as I now think, put it in the drawer of the bureau or chest of drawers in the room in which the testator was then lying. Next day morning Mr. Rittleton Walker came over to Thomas T. Taylor’s house, and I think that he and Edward Taylor and myself went from the porch to the room of the testator together. Mr. Edward Taylor got out the will; Major Taylor acknowledged it, and requested Mr: Walker to witness it. Mr. Walker turned to me and said he could not write his name, and requested me to write it for him. This I did, and he made his mark. This occurred about 7 o’clock in the morning. The testimonj'- of Bloxom and Walker substantially agrees with that of Corbin in regard to their respective attestations. The will was subscribed by each of them in the presence of the testator. Corbin was present when the will was acknowledged to, and subscribed by Bloxom and Walker respectively, but neither of them was present when it was subscribed by Corbin, who did not subscribe it after either of the subsequent acknowledgments. Thus the will was twice acknowledged before two witnesses present at the same time, and these witnesses subscribed it in the presence of the testator. But one of the two witnesses subscribed prior in time to either of the two acknowledgments, and did not actuallj' subscribe it in the presence of the other. On these two grounds it is contended that *115 {he execution is defective, and that under the ] new statute of wills, Code, p. 516, § 4, which governs this case, the will must be subscribed by at least two competent witnesses after it has been signed or subscribed in their joint presence ; and must be subscribed by them not only in the presence of the testator but in the presence of each other. ¡ The words of the section are, “No will shall be *valid unless it be in writing and signed by the testator, or by some other person in his presence and by his direction, in such manner as to make it manifest that the same is intended as a signature; and moreover, unless it be wholly written by the testator, the signature shall be made or the will acknowledged by him in ihe presence of at least two competent witnesses present at the same time; and such witnesses shall subscribe the will in the presence of ihe testator, but no form of attestation shall be necessary.”
It is contended by the counsel for the appellant that this part of the statute is almost a literal transcript of the statute, 1 Vict. ch. 1, § 9, which, before the enactment of our new Code, had been construed by the English courts according to the view maintained by him on each of the two grounds above mentioned; and that our statute ought to receive the same construction.
It is certainly true, as a general rule, that when an English statute, especially one of long standing, is adopted in this stale, the settled judicial construction which it had received in that country at the time of its adoption in this, is also adopted along with it.
But that rule hardly applies to the revision of 1849, in which our whole code of laws, civil and criminal, was revised and re-enacted. The rule which would seem to be more applicable to that revision is that the old law was not intended to be altered, unless such intention plainly appears in the new Code. The legislative mind was fixed on the then existing law as the text, to be altered only as occasion might seem to require. Great alteration was made in words and phraseology, while comparatively little was made in substance. The codes and statutes of other states were consulted and made contributory to some extent; but not with any intention of losing sight of onr own, and adopting altogether the system of another stale or *country on any branch of the law. Spencer, J., in delivering the opinion of the Court of errors of New York in Taylor v. Delancey, 2 Caine’s Cases 143, thus speaks of the rule which is applicable to such a case as this: “Where the law antecedently to the revision was settled, either by clear expressions in the statutes, or adjudications on them, the mere change of phraseology shall not be deemed or construed a change of the law, unless such phraseology evidently purports an intention in the legislature to work a change. A contrary construction might be productive of the most dangerous consequences.” The same principle has been recognized in other cases. Yates’ Case, 4 John. R. 317, 359; Matter of Brown, 21 Wend. R. 316; Theriat v. Hart, 2 Hill’s N. Y. R. 380.
The 4th section of our present law óf wills seems to differ, in substance, only in one or two respects from our former law, according to its settled construction. The first and perhaps most important difference is that the present law requires all wills to be in writing, with an exception made by the 6th section. The next, and perhaps only other, difference arises from the introduction of the words “present at the same time’ ’ after the word “witnesses” in the new law. It had been well settled under the old law, that a will might be acknowledged before the witnesses at different times. In Dudleys v. Dudleys, 3 Leigh 436, the will was attested by one witness in 1818, and by the other in 1825. The evil arising from this construction was, that the testator might be capable of making a will at the time of one of Ihe attestations, and incapable at the time of the other, and only one attesting witness could prove the important fact of mental capacity at either time. Wills are frequently, if not generally, executed by persons in extremis, whose powers of mind as well as of body are gradually sinking. They are often capable one day, and incapable *the next, of making a will. The words in question were introduced to remedy this obvious evil. There seems lo have been considerable opposition in the legislature even to ibis change. The words 1 ‘present at the same time,” in the report of the re visors, were stricken out by a committee of the whole house of delegates; but were restored by the house itself. The provision in the new law that the will should be signed “in such manner as to make it manifest that the name is intended for a signature,” was no change, of the old law; but merely ail express adoption of the judicial construction it had received in Waller v. Waller, 1 Gratt. 454. The words in the new law authorizing the will to be acknowledged by the testator in the presence of the witnesses, were .not in the old law, but they only embodied the long-settled construction of that law. The words “but no form of attestation shall be necessary,” in the new law, effected no change ; no form of attestation being necessary under the old law. Pollock & wife v. Glassell, 2 Gratt. 439.
On the other hand, there are some material differences between the 4th section of our new law and the 9th section of 1 Vict. ch. 26. 1st. The latter requires the will to be “signed at the foot or end thereof;” the former requires it to be signed ‘ ‘in such manner as to make it manifest that the name is intended as a signature.” 2dly. The latter requires that “such signature shall be made or acknowledged by the testator,” in the presence of the witnesses; the former requires that “the signature shall be made or the will acknowledged by him,” in the presence of the witnesses. 3dly. The latter does not even require the witnesses to be “credible,” as the statute *116 of Charles did, but on the contrary, the 14th section enacts “that if any person, who shall attest the execution of a will, shall, at the time of the execution thereof, or at any time afterwards, be incompetent to be admitted a witness to *prove the execution thereof, such will shall not on that account be invalid.” The former requires the witnesses to be “competent;” thus working no change in the old law, but merely substituting in the new law a more appropriate word, “competent,” for the word “credible,” in the old law, which had been judicially construed to mean “competent.” 4thly. The words “shall attest” in the latter (which were perhaps merely superfluous) are not in the former. 5thly. The former does not require a will, “wholly written by the testator,” to be authenticated by attesting and subscribing witnesses; the latter makes no such exception.
Thus it will be seen that there is a closer correspondence, in substance at least, between our old and new law, than between the latter and the statute of Victoria. And I can see no good reason for giving to the-decisions of the English courts upon their statute any greater weight in the construction of ours, than they are intrinsically entitled to. If thej' appear to be founded on good reasons, and are not in conflict with our own decisions, they ought to be followed by us; otherwise not.
I will now proceed to consider the two grounds on - which it is contended that the execution of the will and codicil in this case was defective: And
1. That the subscription of each of the two attesting witnesses must be made after the signature or acknowledgment by the testator in the simultaneous presence of both; whereas in this case the subscription of one of them was made before.
In support of this ground the counsel for the appellant relied on three decisions of Sir Herbert Jenner Fust, viz: Allen’s Case, 7 Eng. Ecc. R. 131; Simmond’s Case, Id. 374; and Moore v. King, Id. 429. The first two were ex parte motions. In each of the three cases the will was subscribed by the two witnesses on different days; but the first witness was present *at the acknowledgment before, and subscription by, the second; though he did not then resubscribe the will. In the last case there was this additional feature, that the first witness pointed out her signature to the second when the latter was about to subscribe the will. In each of the cases the decision was against the will. Whether that would have been the decision if, as in this case, the transaction had occurred at one and the same time, but one of the witnesses had signed an instant before the acknowledgment by the testator in the simultaneous presence of both, is perhaps not certain: . though I think it may fairly be inferred that it would, from what was said by the judge in those cases, and in Olding’s Case, Id. 341, and Cooper v. Bocket, Id. 537; in which two latter cases he decided that a will must be signed by a testator before it is subscribed by witnesses, whether the two acts occur at the same or different times. The opinion of this learned judge seems therefore to be in favor of the appellant on the question under consideration.
I must say, however, that I do not consider that opinion reasonable, and if it were unopposed by any countervailing decision, I would not be willing to follow it. But there are three decisions of this court which I think are in conflict with that opinion, and against the appellant on this question. It is true they were decisions under our old law; but I do not think there is any material difference between the old and new law in this respect. These decisions are Pollock & wife v. Glassell, 2 Gratt. 439; Rosser v. Franklin, 6 Id. 1; and Sturdivant v. Birchett, 10 Id. 67.
In Pollock & wife v. Glassell, the name, of the first witness was signed diverso intuitu, and whether in the presence of the testatrix or not, does not appear; though it was certainly not signed at her request, and was signed before the name of the testatrix was signed. The authority of that case cannot be weakened *by saying that the question was not discussed by the counsel nor considered by the court. It cannot be supposed that the able counsel who argued, and learned judges who decided that case, would have overlooked so important a question, or passed it by without notice, if they had entertained a doubt about it. Nor can the authority of the case be weakened by saying that the codicil was executed under a power of appointment ; for the whole settlement creating the power superadded a requisition not made by the statute of wills; it did not dispense with any of the statutory requisitions ; and it was not pretended that a compliance with any of them was unnecessary. The question considered by the court was, whether the codicil was well executed according to the statute of wills, and had also the superadded requisition? The court, consisting of four judges, decided the question unanimously in the affirmative.
In Rosser v. Franklin, the testatrix made her mark after the subscription of the witnesses. It was argued by the learned counsel against the will, that the witnesses must attest a perfect, not an imperfect instrument; a will signed by the party, and not a paper without a sig-nature. And he cited Olding’s Case, 7 Eng. Ecc. R. 341, and Byrd’s Case, Id. 391, in which the precise question arose, and was adjudicated in that way, although both the attestation and signing occurred at the same interview, and the one immediately preceded the other. It was held by the court, however, in disregard of these decisions of the Ecclesiastical court, that “the fact whether in the order of time the testatrix made her mark before or after the subscription of the witnesses, is, under the circumstances, in nowise material, in so much as the whole transaction must be regarded as one continuous, uninterrupted act, conducted and *117 completed civil hill a few minutes, while all concerned in it continued present, *and during the unbroken, supervising, attesting attention of the subscribing witnesses.”
In Sturdivant v. Birchett, the will was subscribed by all the witnesses out of the presence of the testator; but they immediately returned to his presence with the will. Their subscription was invalid until their return; and was made effectual by what then occurred, though they did not resubscribe the will.
These decisions of our own court are strongly sustained by cases decided elsewhere. The case of Swift v. Wiley, 1 B. Monr. R. 114, goes farther than any of our own cases in favor of the validity of a subscription by witnesses before the signing or acknowledgment by the testator. In that case two of the witnesses subscribed the will some hours before it was signed by the testator; but having remained with him until it was signed by him in the presence of themselves and another, and having then again acknowledged their respective signatures as subscribing witnesses, their subscription was held to be valid. To resubscribe their names, said the court, “would have been a superfluous and puerthe act of mechanical repetition, not necessary for indentification ; because they had once subscribed the same paper in the presence and at the request of the testator, and which fact was recognized by him as well as by themselves, after his own name had been subscribed, and when the document thus recognized and identified, was finally and conclusively published as his will; nor can we perceive any other end of either utility or security that could have been promoted by again subscribing names already sufiicientlj' subscribed.” For the other cases on the subject, I refer to the opinion of Judge Tee in Sturdivant v. Birchett, in which they are fully collected arid commented on.
The case under consideration is stronger in favor of the will than either of the four last cited. In this *case these important circumstances concur, some one or more of which did not exist in either of those cases, viz: both of the witnesses subscribed their names as such to the will in the presence and at the request of the testator, after it had been perfected by his signature, and he then acknowledged it in their joint presence : The whole transaction having been begun, continued and ended at one time and without interruption. And I think there existed in neither of those cases a single essential circumstance which did not exist in this. For though there was no verbal recognition by Corbin of his signature after the acknowledgment by the testator in the joint presence of the two witnesses, there was an actual recognition of it by him, at least as effectual as words could make it.
I conclude, therefore, that both reason and authority are against the appellant on the first ground on which he rests his objeclion to the execution of the will; and I will now consider the other ground, which is
2dly. That the witnesses must subscribe the will in the jiresence of each other.
The old law certainly did not require the witnesses to subscribe in the presence of each other. As the acknowledgment might be made before them separately and at different times, it followed necessarily that they might subscribe separately and at different times. Nor does the new law expressly require them to subscribe in the presence of each other. But it is contended that this is implied by certain phraseology used in the new law, and not to be found in the old. That phraseology is, that the acknowledgment by the testator must be “in the presence of at least two competent witnesses, present at the same time; and such witnesses shall subscribe the will in the presence of the testator. ’ ’ The statute of Victoria uses nearly the same words ; the only difference being that the word “competent” in our law is no! In that statute *and the words “shall attest and,” which in that statute precede the words “shall subscribe,” are omitted in our law; but that difference is merely verbal in regard to the question tinder consideration. It is admitted that the two laws in this respect are substantially identical ; and it would seem they ought to receive the same construction. There has yet been no judicial construction of our law. But a case has been recently decided by the judicial committee of the queen’s privy council in England which was much relied on by the counsel for the appellant, and is supposed to have conclusively settled that the statute of Victoria requires the witnesses to subscribe in the presence of each other. That case is Casement v. Fulton, decided in 1845, and reported in 5 Moore’s Privy Council Cases, p. 130. It was an appeal from the Supreme court of judicature at Calcutta; and arose on the 7th section of the India will act, which is a copy of the 9th section of the statute, 1 Vict. ch. 26, except that, like our law, it omits the words “shall attest.”
The case was this: A testator signed his will in the presence of a witness who subscribed it in his presence; about two hours afterwards, upon the arrival of another witness, the testator in the joint presence of the former witness and the other subscribing witness, acknowledged his signature at the foot of the will. The second witness then subscribed the will, and the first witness, in his and the testator’s presence, acknowledged his subscription, but did not resubscribe. It was held by the judicial committee, (affirming the sentence of the Supreme court at Calcutta,) that the requirements of the act had not been sufficiently complied with; it being necessary that both witnesses should be jointly present at the same act of the testator, and jointly subscribe it in his presence. Tord Brougham in delivering the opinion of the committee, said, “We think the words admit of no other construction, *for it *118 is, ‘arid such witnesses shall subscribe.’ Now this forms one sentence with the preceding words, ‘present at the same time,’ and ‘such’ must plainly be read, ‘such present witnesses, or such witnesses so being present at the same time.’ ‘Such’ describes not merely the names of the witnesses, but all that is previously enacted respecting them. One quality of these witnesses is, their being present at the same time. Therefore, we cannot limit the meaning of the large word of reference, ‘such,’ to the mere names or persons of the witnesses; it must embrace what had just been said of thgir presence; it must mean the witnesses, &c. present at the same time.”
It will be observed that in Casement v. Fulton the will was signed by the testator and subscribed by one of the witnesses at one time, and the acknowledgment by the testator, in the joint presence of both witnesses, was at a different and subsequent time. And it had been decided by the English Ecclesiastical court in the cases before cited, that such an attestation was not sufficient; even though the first witness acknowledged his signature at the time of the acknowledgment by the testator in the joint presence of both witnesses. If these cases were regarded as authority, there seems to have been no necessity for deciding, if it was decided, in Casement v. Fulton, that the witnesses must subscribe in the presence of each other; for the attestation was otherwise insufficient. It will also be observed that there is a very important difference between that case and the one under consideration, in this, that in the latter the whole transaction occurred at one and the same time ; there being no breach of continuity, and little if any greater interval between the different parts of the transaction than the necessary order of sequence required. The decision of the comihittee might possibly have been different, if the facts before it had been like . the facts of this case, *with the single exception that both of the witnesses had signed after the testator: a fact decided to be material by the English courts, but immaterial by ours. But whatever would have been its decision in such a case, and whatever may have been its actual decision in the case before it, there can be no doubt, from the language used by Bord Brougham, that in the opinion of the committee the statute requires the witnesses to subscribe their names in the presence of each other. The opinion is certainly entitled to great respect: And if it had been before the legislature when the present law of wills was enacted, it might have had a very important influence in the construction of our law.
But that opinion was not before the legislature ; and it is almost certain that not a member of that body had then any knowledge'or information of any such opinion, or that any such case had been decided. The case had not, I believe, been reported in any form' in this country'. There has yet, I believe, been no American edition of Moore’s Privy Council Cases; and the Bondon edition of that work has, during the present year, for the first time, been added to our state library. The 5th volume of the work, which contains that case, embraces the decisions of the committee during the years 1845-47, and could not have been long published even in England when the new law of wills was enacted 1 in this state. The last volume of Reports of English Probat Cases, which had then been published in this country, was 7 Eng. Ecc. Rep. containing 2 and 3 Curteiss. Whthe that volume, as we have seen, contains several cases bearing upon the first ground of objection to the will in this case, it contains none which can have any material effect upon the second ground of objection now under consideration. Nor is there any such case in any prior volume of English Probat Cases. Indeed I believe 1 Curteiss commences *about the time that the statute of Victoria went into operation. On the contrary, it is manifest from the decisions of Sir Herbert Jenner Fust, in some of the cases before cited, that in his opinion the statute does not require the witnesses to subscribe in the presence of each other; though he is of opinion that it requires both of them to subscribe the will immediately after it is signed by the testator, or his signature acknowledged in their joint presence. In Cooper v. Bockett, 7 Eng. Ecc. R. 542, he expressly says, “By' the 9th section of the act of parliament, it is absolutely necessary that the deceased shall have signed the will, or have acknowledged his signature, in the presence of two witnesses present at the same time, and that they should have attested it in the presence of the testator, though not of each other.” Whthe Casement v. Fulton was unknown to the legislature when the present law of wills was enacted, Cooper v. Bockett was reported in a volume which had some years previously been published in this country, and was then in the state library. If the construction given in either case can be considered as having been tacitly' adopted by the legislature in the enactment of our law, it is that given in the latter, rather than that given in the former case. The opinion given in the former is, therefore, entitled to no other consideration in this case than that which is always due to the opinion of learned jurists, and that which may be due to the reasons on which it is founded.
Giving to the opinion expressed in Casement v. Fulton all the consideration to which it is entitled, I must say that I cannot see the force of the reasons on which it is founded. It seems, almost entirely', to rest on the import of what is called “the large word of reference, such;” which, it is supposed, “describes not merely' the names of the witnesses, but all that is previously enacted respecting them.” It “must plainly be read; *(says Bord Brougham,) such present witnesses, or such witnesses so being present at the same time.” Admitting this to be the true import of the word “such,” I think it by no *119 means follows that, according to the grammatical construction of the sentence, the witnesses are required to subscribe in the presence of each other. “Such witnesses so being present at the same time” when ihe signature is made or acknowledged, surely need not of necessity subscribe in the presence of each other.
But whatever may be said of that case, 1 think the legislature of Virginia, in the enactment of our new law, did not intend io require the witnesses to subscribe the will in the presence of each other. It was .i very important change in the law to require them to be together when the will is signed or acknowledged. Good reasons ex-j sled for that change; and yet, as I have before remarked, it was strongly opposed in ihe legislature. Surely no greater change was intended than the words express. If the supposed change had been intended, it would have been made plainly, and not 631 mere implication, or the use of a word of equivocal import. The obvious mode of making it would have been, by the insertion of the words “and each other:” so as to make the sentence read '! and such witnesses shall subscribe the will in the presence of the testator and each other. ’ ’ The express requisition that they shall subscribe “in the presence of the testator,” seems to exclude any implication that they shall subscribe “in the presence of each other.” There would have been as much reason for expression in the one case as the other, if both- had been intended. The word “such” would have had as much efficacy in requiring the act to be done by the witnesses in the presence of the testator, as in requiring it to be done in the presence of each other. The law of wills should be plainly written, and no room should be left *for doubt or implication. It is a law of almost universal applica1 Hon, and must often be acted on by unlearned persons, in a situation which precludes the possibility of obtaining professional aid. The most important family settlements, which are often xiostponed to the last day or hour of life, may depend upon an observance of its requisitions. How important then that it should impose no needless requisition; none that is not productive of some substantial good; and that it should plainly express what it means. A requisition that the witnesses shall subscribe in the presence of each other, would be a fruitful source of litigation, would defeat many fair wills, and would, I think be productive of no corresponding good. It would very much clog the exercise of the testamentary power, without throwing around it, so far as I can perceive, a single additional safeguard. It would render it necessary to enquire in every case, whether the witnesses, when they subscribed the will, were not only in the presence of the testator or in the range of his vision, but also in the presence of each other or in the range of each other’s vision. It would be questionable whether range of the vision would be sufficient in regard to the witnesses inter se, and whether actual sight would not be necessary. Hor though a testator may dispense with actual sight of the witnesses if they are in the range of his vision, it being his own matter, it would for that very reason, be doubtful whether the witnesses coukl dispense with actual sight of each other. Nothing is more common or natural than for a scrivener to subscribe a will as a witness before his fellow witness is called in to join him in the attestation; or, for a witness called on to aüest a will, after doing so, to turn his back and walk off without noticing what is done by others afterwards. No case could present a more striking illustration of the application of these remarks and the ill effects of *such a requisition than the case under consideration. The two attesting witnesses, Corbin and Bloxom, being in the room with the testator, the latter requests Bloxom to step out awhile. The testator and Corbin being then alone in the room, the door is closed, and the will is written by Corbin, signed by the testator, and subscribed by Corbin in the presence of the testator, and at his request. The lestator then requests Corbin to call in the other v'itness, that he rna,y subscribe it also. Bloxom is accordingly called in from another room; comes immediately in, and the three being then alone in the testator’s room, and the will lying on the table with the names of the testator and Corbin thereto just subscribed; the testator acknowledges the will, and at his request Bloxom subscribes it in the presence of the testa tor and Corbin, and the will is then handed by Cor-bin to the testator. If this will were defeated because the witnesses were not in the presence of each other when Corbin subscribed it, then indeed might it be said that substance would be sacrificed to form, and the end of the law to the means used for attaining it. But I think form as well as substance, the means as well as the end, sustain the validity of this will, and that its excution is not defective on the second, aminore than 011 the first ground relied on bj* the appellant.
2dly. As to the codicil.
The facts in regard to the execution of the codicil are very much like those in reg-ard to the execution of the will. Many of them have been already stated, and need not be repeated. Corbin and Robert J. Silver-thorn, two of the subscribing witnesses, spent a night together at the testator’s. Early next morning the codicil was written b3r Corbin, who signed the testator’s name thereto in his presence, and at his request; the testator made his mark in the presence of Corbin, who, in his presence and at his request, subscribed it *as a witness. R. J. Silverthorn, who had not come down stairs, was then called in by Corbin to witness the codicil also, and accordingly came in ; when Corbin took up the will and carried it to the testator, who according to Corbin’s testimony, said, “I acknowledge this, and want you to witness it;” or, according to R. J. *120 Silverthorn’s testimony, Corbin asked the testator if he acknowledged it, and the testator said he did. R. J. Silverthorn then subscribed it in the presence of the testator and of Corbin.
The grounds of objection to the execution of the codicil are the same as those taken to the executon of the will; and the facts in regard to each being substantially the same, I am of opinion that the codicil was well executed, for reasons which have been already given. I think it makes no difference whether the instrument was called a codicil or not by the testator at the time of its acknowledgment, and that the principle, declared in the cases of The British Museum v. White and Rosser v. Franklin, is at least as applicable to the new law as to the old. It is necessary that the testator should understand the contents and nature of the instrument when he executes or acknowledges it; but not that he should call it by any particular name, or even by any name at all. The old law, by judicial construction, accepted acknowledgment, in lieu of signature, by the testator in presence of the witnesses, and did not require the instrument to be named in the acknowledgment. The new law adopts that construction, by expressly authorizing such acknowledgment, which may be made in any form in which it might have been made under the old law. No formula of acknowledgment is prescribed by law.
I am therefor of opinion that there is no error in the sentence of the Circuit court to the prejudice of the appellant. This opinion, however, is intended to *be referred and confined to the peculiar facts of this case; and especially the important fact that the whole transaction in regard to the execution and attestation of the will occurred at one and the same interview, and without any breach of continuity. The same observad ons apply to the codicil. I do not mean to say that either would have been well executed and attested if there had been a substantial interval of time between the acknowledgment by the testator in the joint presence of the two witnesses, and the subscription by the witnesses or either of them. As was said by my brother Fee in Sturdivant v. Birchett, “It will be quite time enough to decide that question when a case requiring it to be decided shall come before us for adjudication.”
My opinion is intended to have no reference to the attestation of the will by Walker, or the codicil by William T. Silverthorn; but to be confined to the attestation bj' the other two witnesses to each.
But I think there is an error in the sentence to the prejudice of the appellee, in refusing to admit to probat that clause of the codicil which relates to Poplar Grove. Though the testator at first objected to that clause, and said it ought not to have been put there, and that he would send for Mr. and Mrs. Parramore and have that matter settled; yet it does not appear that any fraud was used in having the clause inserted; and when the effect of it was explained to him by Corbin, the testator refused to let it be stricken out; and executed and acknowledged the codicil containing the clause as part thereof. The execution was not conditional but absolute; and the codicil was not afterwards revoked in whole or in part.
The result is that I am for affirming so much of the sentence as admits the will and part of the codicil to probat; for reversing so much as refuses to admit the *residue of the codicil to probat; and for admitting such residue to probat also; with costs to the appellee as the party substantially prevailing.
LEE and SAMUELS, Js., concurred in the opinion of Moncure, J.
ALLEN and DANIEL, Js., dissented.
Sentence reversed in favor of the appellee.