Staples, J.,
delivered the opinion of the court.
The first ground of defence relied upon in the court below by the appellants, is that at the period of the testator’s death, it was not competent to emancipate slaves by will or otherwise without at the same time making provision for their removal from the commonwealth. And as no such provision was made in this case, the emancipation did not take effect; and as a necessary consequence the legatees were incapable of taking the legacies bequeathed them. This ground was very properly abandoned by counsel in the argument here, for although, according to the laws then in force, no slave emancipated since 1806, or thereafter, was permitted to remain in the state more than one year after being twenty-one years of age without lav/ful permission, it was not required that the owner should make provision for the removal of such slaves as a prerequisite to the exercise of a valid act of emancipation. Code of 1849, chap. 104. sec. 9; chap. 107, sec. 2.
The second ground of defence relied upon is, that Martha and her three children were entitled to the legacies given them only in the event that Mrs. Simmerman, the testator’s widow, married again, and as that event did not happen, the legacies did not take effect. This argument would equally prove that the testator did not intend to emancipate the slaves in question except upon the contingency of the marriage of his widow. And *the learned counsel has argued that such is the proper construction of the will. Tt is plain, however, that this is not the meaning of the testator. His intention was that his widow should have control of Martha and her three children during her life; and at her death they should be free. He was willing that she should have such control even though she might marry again, but he was not willing that any other person after her death should exercise dominion over them. The intention of the testator is not to be collected from any isolated clause, but from the whole will. Nor can clear and unambiguous provisions in one part of the instrument be controlled by mere inference and argument from general or ambiguous provisions in other parts of the instrument. Rayfield and wife v. Gaines et ais., 17 Gratt. 1.
If in this case the. second clause of the will presented the slightest difficulty, that difficulty is removed by the sixth, wherein the testator gives to his daughter. Mary Ann G. Simmerman, all the money on hand at his death, together with all debts due him by note or account, “except the amounts devised to my wife, Margaret Sim-merman, and my slaves, Martha and her three Children, Charles, Mary and Adam. My intention as that the amount devised to my slaves. *346 above mentioned, shall be paid to them at the death of my wife; at which time they are to be free.” It would be difficult to use language more explicit or comprehensive.
Considering this clause in connection with the other provisions of the will,, it is apparent it was the purpose of the testator that at the death of his widow, these, his favorite slaves, should have their freedom, and the legacies bequeathed them; and that neither one nor the other should be made to depend upon' so uncertain and improbable an event as .her marriage.
*The third and main ground of the defence relied upon'in the court below. is that the legacies in controversy were given to the persons named on the implied condition, that at the death of the widow they should answer the description and character given'to them in the will; that is to say they should be persons emancipated by the will, and should have been slaves and serving the widow as such down to the period of her death; whereas the appellees derived their title to freedom from the government of the United States, and did not serve the widow as slaves, but in the capacity of freedmen and tenants under contract.
One of the cases cited in support of this position, is that of Johns v. Scott, 23 Gratt. 704. As this case is .relied on with much confidence, it becomes necessary to examine it with some care, in order to understand what were the precise points decided. It will be seen that the decision was placed mainly upon the ground that as none of the legatees were named in the will, all idea of mere individual benefit was excluded; and as a class of persons only was provided for by the will to answer a certain description and character pointed out in unmistakable terms by the testator himself, it was incumbent upon the .claimants- of the legacy to bring that class within these terms before they could successfully assert a title- to the legacy. Judge. Bouldin, who delivered the opinion of the court, lays marked stress upon the peculiar language of the will, in providing that the claimants of the legacy were to be the testator’s freedmen, his slaves emancipated by him under his will, and were to remain slaves, and as such to serve the testator’s wife- and daughter, until the death of the survivor. So far from answering this description, the appellees claimed their freedom under another and higher power, and against the will. The event on which their claim to the legacy depended had *not then occurred! The testator’s dáughter was still alive, and might live for many years. Before she died any one of the persons then claiming a legacy dependent on that, event, might themselves be dead. These, citations will sufficiently show the grounds, upon which the opinion in Johns v. Scott rested.
It is very true that Judge Bouldin, towards the conclusion of the opinion, adverts to another rule of law which he supposes had some bearing upon the case. That rule is, that although the legatees be the person named, yet if he does not bear the character and sustain the relation to the testator set forth in the will, and which induced the bequest, he cannot take the legacy. The principle of the cases cited by Judge Bouldin in this connection, is. that if a legacy is given to a person by name, which has-been falsely assumed, or if the testator is in any other way imposed upon and induced by a supposed relationship to make a gift which he otherwise probably would not or might not have done, the «mrt will, upon the ground of fraud, hold the bequest inoperative and void.
It is very, obvious that this principle can have no just application to a case like the present, where the -legatee is named in the will and answers fully the description given of him therein; but his status is subsequently changed by a power over which he has no control, and which he is unable to resist. All that was said, or intended, in Johns v. Scott, was that under the peculiar circumstances .of that case, the character in which the legatees should claim was to be regarded as the essence of the bequest; and in that aspect the principle which should control was the same in effect established in the class of cases were the supposed relationship was believed to be the sole motive of the gift. The testator had emancipated all his slaves at the death of his daughter; *but she was entitled to them during her life. _ He very naturally supposed their services would amply compensate her for the fund set apart out of his estate, to pay the legacy bequeathed them at the period of their emancipation. It was therefore a very reasonable presumption, that if the testator had known the legatees' would not remain his slaves, and render to his wife and daughter the services required of them, but would assert their freedom outside the will, and -thus disturb its provisions to the great loss of the first objects of his bounty, he would have made no attempt to provide for them. This view was confirmed by the further fact that the legacy given the slaves in that case was to be expended mainly in their removal to some distant state or country, and only the residue to be distributed among them in their new homes. The primary intent of the testator was therefore defeated by the emancipation under the authority of the Federal government, and the continued residence of the legatees in the state. In Johns v. Scott, therefore, it might well be said, that the character in which the legatees should claim was' the essence of the bequest.
There is, however, another class -of cases emite distinct from those cited by Judge Bouldin, which, though establishing a dif•ferent rule, are entirely consistent with the latter. -They are cases in which the legatees being named, errors in the description were determined not to vitiate the legacies, as not being • essential, and on the presumption that personal affection might have been ingredients in the bequests; which errors would not have induced the testator to withhold his bounty, had he been acquainted with all the circumstances of the case; a presumption *347 which can never be made where the supposed relationship is the sole motive of the bounty.
2 Red. on Wills, 348.
*Thus in Kendall v. Abbott, 4 Vesey R. 802-808, cited by Roper, Lord Al-vauley said, that when a person was supposed to be a child of the testator, and from motives of love and affection to the child conceiving it to be his own, the latter made provision for it, and it afterwards turned out that he was imposed upon, the child not being his own, his honor was not disposed to determine that the provision for the child would totally fail; for circumstances of personal affection to the legatees might be blended with the gift which might entitle the child, although he might not answer the character in which the legacy was given.
The same learned author, Roper, says: It was said in argument in the case of Brett v. Rigden, Plowd. R. 340, 344, that if a bequest were, made to the wife of J. S., and J. S. afterwards died, whose widow thereupon married J. D., and then the testator died; the wife of J. D. would be entitled to the legacy, although she was not the wife of J. S. at the time the will took effect, and therefore did not answer the description at that period.
In Schloss v. Stiebel. 6 Sim. R. 1, the testator being engaged and bethrothed to a lady, and after mentioning her by name in his will, and alluding to his intended marriage with her, he gave £3.000 to his wife. During the engagement, but before the marriage, the testator died. It was held that she was entitled to the legacy, upon the ground it was not given on the condition of the testator marrying her, but that he had described her in reference to his intention of marrying her.
There are other cases to the same effect, cited by the same author; but these are sufficient to show that the courts will often sustain the legacies where personal affection is presumed to be an ingredient in the bequest, although the legatee may not answer the description given of him when the will takes effect. Let us see *how these principles apply to the case in hand. In the first place the legatees are respectively named in the will. The legacies are given to them, not as a class, but as individuals. The testator, after the clause of emancipation, says, ‘T also direct that she. Martha, shall have the following property: two horses, worth seventy-five dollars each, and a good two-horse wagon; and T also direct my executor to pay to her. Martha, one thousand dollars for her own use, also one thousand dollars to her son Charles, also one thousand dollars to her daughter Mary, and one thousand dollars to her son Adam.” These provisions strikingly distinguish the case from that of Johns v. Scott.
Again: the testator does not emancipate all his slaves: on the contrary, he be-queathes all of them to his wife and daughter. except the four named, the special recipients of his bounty. Why he thus discriminated in their favor is a matter of some controversy. On the one hand testimony has been adduced tending very strongly to show that the children of Martha are also the children of the testator; on the other hand, evidence has been offered tending to show, very slightly however, that they are the children of Samuel Simmer-man, a brother of the testator, and a member of his family. It is, not material to inquire which supposition, or whether either is correct. It is apparent that personal affection, or some other equally potent consideration, influenced the testator in making these bequests. This feeling of the testator was fully shared in by his widow; for she is proved to have entertained a strong affection for them as long as she lived. The case comes, therefore, directly within the principles of the decisions already mentioned. We may conjecture, but no one can assert with confidence, that the testator would have withheld these legacies even if he had known the appellees would obtain their freedom *iu some other way than under the will. He was possessed of an ample fortune, which was mainly given to his daughter. Lor his wife he also made abundant provision independently of these four legatees. The loss of their services for a few years, it is hardly to be presumed, would so injuriously affect the condition of Mrs. Simmerman as to induce the testator, had he known all the facts, to withhold a bounty he obviously considered necessary to the comfort and security of the legatees. The appellants, it is true, are to pay the legatees, but they are not entitled to the services of the appellees. It did not concern them whether the latter were emancipated by the act of the Federal government or by the operation of the will. Whatever loss has been sustained fell wholly upon Mrs. Simmerman. She alone had just cause of complainant. The appellees, it appears, remained with her until her death; one of them certainly acting precisely in the same capacity as before emancipation. The services rendered by the others were entirely satisfactory to Mrs. Simmerman. She, no doubt, indulged them in many privileges before and after they were free. So far as she was concerned it is manifest that emancipation effected but little change in the condition and conduct of the appellees; but her losses, whatever they were, resulting from the claim to freedom outside the will, can in that case furnish no just ground of offence to the appellants.
Upon the whole, l think there no fact or circumstance or presumplion in the case upon which the court would be authorized to disregard the plain and unambiguous provisions of the. will in favor of the appellees.
The fourth and last ground of defence relied on in the court below was that the ap-pellees had lost the right to recover the legacies, because from the close of the war to the death of Mrs. Simmerman. they had, by the *exercise of undue influence upon the feeble mind of Mrs. Simmerman, obtained control of her prop *348 erty and appropriated the same to their own use, to an amount much exceeding the value of the legacies, and to a corresponding extent have diminished the estate, which at the death of Mrs. Simmerman would revert to the appellants; and as the appellees were wholly insolvent, the only remedy of the appellants was by way of set-off against the legacies.
In considering this ground it must be borne in mind that- Mrs. Simmerman was entitled absolutely to the personal property, and to the rents and profits of the real estate in her possession. (She might, if she pleased, permit the appellees to use and enjoy the land without compensation, and she might give them any or all the personal property, and no one could legally complain or hold her or them accountable. The only question then is, whether the appellants have shown such want of capacity on Mrs. Simmerman’s part, or the exercise of such undue influence on the part of the appellees, as renders an account proper in this case. There is not the shadow of a doubt that Mrs. Simmer-man, prior to the period of her accidental poisoning, was competent to understand and manage her own affairs. There is more difficulty with regard to her condition subsequent to that period. I think, however, the weight of the evidence establishes that she was of sound mind until within a few months previous to her death. Her intellect was somewhat impaired by the infirmities of age and disease, but she was not an imbecile. She was not a person for whom a committee might properly have been appointed. Dr. Jas. Gibboney, her regular attending physician for. many years, who had repeated conversations with her upon matters of business, and who was well acquainted with her condition, uses this emphatic language:
“Her mind *was affected at the time she was poisoned, but in a few days she was rational as ever. She so remained up to within a few months before she died.” He further says: “I believe that the delirium was the result of the disease at the time and was merely sympathetic, and not idiopathic, as she recovered her mind upon the improvement of her physical condition.” Such testimony, that of an attending physician, is always entitled to peculiar consideration.. Burton v. Scott, 3 Rand. 399-403. In this instance it is sustained by other witnesses, and by the facts and circumstances of the case.
And now as to the undue influence. After a careful examination of the record I have been unable to find any evidence of it. It is important in the first place to consider what is meant by the phrase “undue influence.” “The influence to vitiate an act must amount to force and. coercion destroying free agency. It must not be the influence of affection and attachment; it must not be the mere desire of gratifying the wishes of another;, for that would be a very strong ground in support of a testamentary act. Further, there must be proof that the act was obtained by this coercion, by importunity which could not be resisted; that it was done merely for the sake of peace, so that the motive was tantamount to force and fear.” This is the definition given by an eminent author, Jarmyn on Wills, page 29, supported by numerous authorities, and approved by this court in Parramore v. Taylor. 11 Gratt. 220; Redf. Amer. Cases upon the Law of Wills, 280, 725, 735-6-7, 741; Greer v. Greer, 9 Gratt. 330.
Without entering into a discussion of the evidence bearing upon this branch of the case, which would be both unprofitable and unnecessary, I repeat the testimony fails utterly to disclose any such coercion or importunity on the part of the appeilees as was calulated to constrain *Mrs. Simmerman to do what she was too weak to resist or unable to refuse. There is no doubt that Mrs. Simmerman often permitted her affections to control her judgment in the bestowment of gifts upon others, and that she was for many years before and after the war surrounded by a crowd of worthless and improvident people, who profited greatly by her kindness and ill-judged liberality.
But the appellees were not the only persons in her employ. There were others living u|ion her land, both white and black; all, no doubt, partaking of her bounty more or less. One of the appellants’ witnesses states “that most every lady in the neighborhood went there to see her.” These people, of course, partook of her hospitality and helped to consume her substance. The appellants knew all this. They lived very close to Mrs. Simmerman, and yet they very rarely went to see her. They left her to the tender mercies of those around her. Why did they not interfere to relieve her from the unjust and improper influences to which she was exposed? If, as is now alleged, she was non compos mentis, why is it that application was not made for the appointment of a committee? We know that such a committee was appointed' within a few months of her death; why was it so long delayed? Every consideration of propriety and self-interest, to say nothing of duty, would have suggested some action of the kind years before it was taken, if the appellants’ present pretension be correct. The conclusion is irresistible, that they fully recognized the fact that Mrs. Simmerman was legally compos mentis, with sufficient understanding to manage her affairs; and her disposition of her property, however improvident or wasteful, could not be successfully impeached.
Under circumstances of so long delay on the part of those who ought to have been vigilant, it would require *a very strong case of incapacity or undue influence to justify the interposition of the court. No such case has been proved. If it was proved, the evidence, I think, fails to establish any such appropriation or use of Mrs. Simmerman’s property by the appellees as could properly be the subject of an account in this case. It is, however, unnecessary to dwell upon this point, as upon the former ground the appellants are not entitled to any set-off against the legacies.
*349 v For the reasons stated, I am of the opinion the decree of the circuit court should be affirmed.
Decree affirmed.

Testamentary Capacity — Family Physician’s Testimony.- — In Shacklett v. Roller, 97 Va. 648, the court says of a family physician’s testimony as to a testator’s capacity, “Physicians, as this court has so often said, are considered as occupying a high grade on such questions, both because they are generally men of cultivated minds and observation, and because, from education and pursuits, they axe supposed to have turned their attention more particularly to such subjects, and therefore to be able to discriminate more accurately, especially a family physician who has attended the patient through the disease which is supposed to have disabled his mind.” Citing the principal ease, and Burton v, Scott, 3 Rand, 399, 403; Parramore v. Taylor, 11 Gratt. 220, 228; Cheatham v. Hatcher, 30 Gratt. 56; Montague v. Allan, 78 Va. 592; C. & O. R. R. Co. v. Mosby, 93 Va. 93.