# 𝕽𝖎𝖈𝖍𝖒𝖔𝖓𝖉.

## CARTER V. CARTER.

### DECEMBER 2d, 1886.

1. CHANCERY PRACTICE—*Pleadings—Demurrer.*—It is a fundamental rule that where a bill in equity fails to show in the party suing an interest in the subject matter and a proper title to institute a suit concerning it, the bill is demurrable.

2. IDEM—*Issues out of chancery—Appealable.*—Legal discretion lies in the chancellor to direct or refuse an issue to be tried by a jury; but the appellate court must judge whether or not such discretion has been soundly exercised, whenever the ruling impliedly involves a settlement of the principles of the cause.

3. IDEM—*Issues not allowable, when?—Case at bar.*—When plaintiff avers that certain deeds were procured by the fraud of the prior grantee from their common grantor, when she was mentally incapable of conveying, and both the grantor and the prior grantee, by their answers, positively deny every material averment, and plaintiff fails to furnish two witnesses, or one and corroborating circumstances in support of the bill, or even to throw the burden of proof on the defendant, and to render the case doubtful by conflicting evidence, no issue should be directed.

4. UNDUE INFLUENCE—*Definition.*—The influence to vitiate an act must amount to coercion destroying free agency. It must not be mere desire to gratify the wishes of another; for that would be very strong ground to support the act in question. It must be proved that the act was procured by this coercion, by irresistible importunity, and was done merely for sake of peace; so that the motive was tantamount to force or fear.

Appeal from a decree of the circuit court of Loudoun county, pronounced on the 24th day of October, 1884, in the suit of Geo.

Carter, Jr., complainant, against Mrs. E. O. Carter, B. G. Carter, and H. Heaton, trustee, and B. G. Carter, Jr., and E. O. Carter, Jr., infants, defendants.

The object of the suit was to annul a deed executed by Mrs. E. O. Carter, December 26, 1882, conveying to B. G. Carter a tract of land called "Moorland," a bond of Dr. McCrae, and certain judgments; and also a deed of August 28, 1880, from her to H. Heaton, trustee, conveying a tract of land called Palser's Springs, in trust for the grantor during her life, and after her death to B. G. Carter, if he survived her, and if not, then to B. G. Carter, Jr., and E. O. Carter, Jr., infant children of said B. G. Carter and grandchildren of said E. O. Carter, the grantor; and also to correct a deed from her to said B. G. Carter, of the same date as the deed last named, conveying to said B. G. Carter the tract of land known as Bellefield "and all the personal property of every kind, including portraits, pictures, furniture, &c., now there, which may belong to the estate of George Carter, deceased, and form part of the rest and residue thereof," so far as that deed conveys family portraits and other personalty.

The facts disclosed by the pleadings and proofs are multitudinous. George Carter, Sr., died at Oatland, his residence in said county, about the year 1841, leaving a very large estate, consisting of land, slaves, debts due him, and other personalty of value. He left also a widow, Mrs. E. O. Carter, and two sons, George Carter, Jr., and B. G. Carter. By his will he constituted Mrs. E. O. Carter his executrix, and she duly qualified and acted as such. The testator's estate is described in the record as one of the finest in Northern Virginia. After providing bountifully for his two sons, by his will he gave his wife, Mrs. E. O. Carter, a large part of his estate for her life, with remainder to his son George; this devise embracing the Oatland's mansion, farm, furniture, pictures, &c., which yielded

an income of several thousand dollars yearly. To Mrs. E. O. Carter in fee he also devised said Palser's Springs property. The large residuum, called in his will "the rest and residue," of his estate, he also gave to her, by her to be given to his sons in such proportions as she might see fit. And he directed that no inventory be taken and no security be required. Among "the rest and residue" of his estate were the Bellefield tract of land and certain furniture, portraits, pictures, &c., there.

Many years prior to her death, which has very recently occurred, Mrs. E. O. Carter relinquished to her son, George, her life estate in the large and valuable property called "Oatland," and its personalty, and then she left "Oatland" and resided thereafter at "Bellefield." In addition to the Palser's Springs property, Mrs. Carter owned, in her own right, in fee, the "Moorland" tract and other lands and personalty.

Much is alleged about Mrs. Carter's intention to carry out her husband's wishes in respect to an equal division of all the property between the two sons—George and Ben—and her often-expressed design to give Palser's Springs to George. But certain it is that on the 28th day of August, 1880, she made and acknowledged the deed to H. Heaton, trustee, for Palser's Springs, and also the deed to B. G. Carter for "Bellefield," &c. It is equally certain that on the 26th day of December, 1882, she made the deed to B. G. Carter for "Moorland;" and afterwards, on the 15th of January, 1883, the grantor and grantee made an endorsement on the last-named deed to the effect that the deed was to be inoperative during her life, and then she acknowledged both deed and endorsement. All three of these deeds and the endorsement were duly recorded.

Later, on the 6th of March, 1883, Mrs. Carter executed a fourth deed, conveying to George Carter "all her right, title and interest in Palser's Springs." The grantee, George Carter,

was not at this time aware of Mrs. Carter's prior deed conveying the same property to H. Heaton, trustee; but he shortly afterwards discovered that his deed gave him only the life estate in Palser's Springs of his mother—a very old person. It was then that he heard also of the deed to B. G. Carter for "Bellefield" and the furniture, &c., there, and misconstrued it as embracing furniture, portraits and pictures which had been bequeathed to him with the "Oatland" estate.

This discovery and misconstruction seems to have provoked the resentment of George, who, with his counsel, made complaint to his mother, who was then over 86 years of age, and had nearly lost her eye sight, but still retained the mental vigor and strength of character which seems to have characterized her entire life. Living with her at this time was her niece, Mrs. A. G. Fitzhugh, as companion and secretary, who wrote and attested her aunt's signature to most of her business papers. Her son, Benjamin G. Carter also lived with her at "Bellefield."

It seems that by reason of the complaint of George Carter and his counsel, and some confusion or misunderstanding as to the effect of the deeds of August, 1880, for Palser's Springs and "Bellefield," Mrs. E. O. Carter was moved to execute a paper dated March 9, 1883, and attested by Mrs. A. G. Fitzhugh, instructing her then counsel, Messrs. Harrison & Powell, to take steps to have said deeds set aside. In a very short time, however, and before the counsel had taken any steps to set aside those deeds, she executed another paper also attested by Mrs. A. G. Fitzhugh, and caused it to be delivered to the counsel, whereby she countermanded the instructions which had been given to them. Thereupon, on the 30th of March, 1883, George Carter instituted this suit against his mother and brother, as principal defendants, for the purposes aforesaid.

The original bill was filed on the 8th of May, 1883. It charges that "the two deeds of August, 1880, were signed by Mrs. E. O. Carter by mistake of fact and were not the deeds she thought she was signing," but the bill does not specify the means whereby the mistake was brought about. It alleges generally that "B. G. Carter had improvidently lost his patrimony, was out of employment, spent most of his time with his mother, had acquired her entire confidence, and obtained a controlling influence over her;" but it ascribes no particular result to such influence. And the prayer is that the trust deed to H. Heaton be annulled and the conveyance of "Bellefield," &c. to B. G. Carter be reformed as to the family portraits, pictures, &c., conveyed thereby, and that the defendants answer its allegations on oath. The bill makes no complaint as to the conveyance of "Moreland" by the deed of December 26, 1882.

On the two last days of May, 1883, Mrs. E. O. Carter being sick and in bed, George Carter and his counsel, visited "Bellefield," her home, and had with her interviews in the presence of Mrs. A. G. Fitzhugh, B. G. Carter, and others. The object of George Carter in making these visits was, as disclosed by the record, to effect some arrangement by which "Palser's Springs" should become his property. In an interview on the day of the first of these visits, in the sick-room of Mrs. Carter, who was in bed, and in the presence of the parties named, she (Mrs. E. O. Carter) signified an earnest desire that her son, B. G. Carter, should settle the matter peaceably by acceding to the request of George and releasing "Palser's Springs" to him. This, B. G. Carter declined to do, for the reason, among others stated by him, that it was not in his power to do so, as the title of the property was not in him, but in the trustee, Heaton. But, in response to the direct question then put by B. G. Carter to his mother, Mrs. E. O. Carter, whether she understood

what she was doing and intended to do what she did in exe-
cuting the deed for "Palser's Springs" to Heaton, trustee,
she answered that she did know what she was doing when she
executed the deed, and that she had intended "Palser's Springs"
for B. G. Carter, but then wished *George* to have it, and urged
B. G. Carter to convey it to George Carter, which he declined
to do as before stated.

The interview thus ended; George and his counsel left. In
their absence they appear to have come to the conclusion that
the desired arrangement could not be effected by the release
of "Palser's Springs" by B. G. Carter, the title thereto being in
a trustee, so another plan was conceived and determined to be
pressed, which was that B. G. Carter should convey "Moor-
land" to George. A deed was accordingly prepared by them,
conveying "Moorland," theretofore conveyed by Mrs. E. O.
Carter to her son, B. G. Carter, to George Carter, and on the
next day, May 31, 1883, again called on her at her home,
"Bellefield," presented the deed thus prepared, conveying
"Moorland" to George Carter, but reserving to Mrs. E. O. Car-
ter a life estate therein; and she signed and acknowledged the
deed, which was dated the 31st of May, 1883, and delivered
the same to counsel (as there is evidence tending to show) to
be delivered to George Carter in the event B. G. Carter should
refuse to convey "Palser's Springs" to George. But she, in
her answer, as well as B. G. Carter, in his answer, in response
to allegations in the amended bill, says that it was delivered to
her then counsel to be by them kept subject to her further
orders. This deed contains recitals apparently intended for
the purposes and were attempted to be used in this suit as evi-
dence of facts tending to invalidate Mrs. Carter's previous deed
to B. G. Carter for the same tract of land.

However this may be, it is nevertheless true that on her
recovery, and on reflection, a little later, Mrs. E. O. Carter, by

the pen of her amanuensis, Mrs. A. G. Fitzhugh, recalled from her then counsel, to whom she had delivered it, the said deed and a paper containing similar recitals, which was by her executed and delivered with the deed; but only the last named paper was returned to her, as the counsel had before receiving the recall delivered the deed to F. E. Conrad, the counsel of George Carter, the complainant. Subsequent to these events—to wit, on the 30th of August, 1883—the amended bill was filed. In it is repeated more in detail the matters set forth in the original bill. And it.is therein distinctly charged that the deeds of August 28, 1880, and the deed of 26th of December, 1882, were executed without Mrs. E. O. Carter knowing at the time of signing them the contents thereof; that she was not then capable of understandingly and freely making such conveyances,·but was under the constraint of the defendant, B. G. Carter; and that they were fraudulently procured from her by his false representations. The amended bill then enters upon a narrative of alleged circumstances to show how the mistakes were effected and the alleged fraud perpetrated, detailing what was said and done in the sick chamber of Mrs. E. O. Carter on the 30th and 31st days of May, 1883, by her, by her then counsel, and by B. G. Carter. It sets forth the execution by Mrs. E. O. Carter of the deed of 31st of May, 1883, conveying to George Carter, the complainant, the remainder in fee, after Mrs. E. O. Carter's life estate, of "Moorland," and its delivery to said counsel, to be by them delivered to complainant in case B. G. Carter refused to convey "Palser's Springs" to the former, and the refusal of B. G. Carter so to convey, and the delivery thereupon of the said deed to the counsel of the complainant before the same had been recalled by Mrs. E. O. Carter. It likewise mentions the instructions given by her to her then counsel on the 9th of March, 1883, to take steps to set aside the deeds of August, 1880, and of December, 1883, and the

countermand by her of those instructions, and recall of the paper and deed aforesaid; which countermand and recall the amended bill alleges were caused by the undue influence of B. G. Carter over his mother, Mrs. E. O. Carter. And the prayer is that the deed to H. Heaton, trustee, for "Palser's Springs," and the deed to B. G. Carter for "Moorland" be annulled, and that the deed to B. G. Carter for "Bellefield" and the portraits, &c., be reformed as aforesaid. It makes the same parties defendants as the original bill made, and calls on them to answer on oath.

These bills the defendants, B. G. Carter and Mrs. E. O. Carter, each demurred to and answered separately, denying in the most direct and positive manner every material allegation contained in the original and amended bills, and especially denying the complainant's right to maintain this suit. The depositions of numerous witnesses were taken, very much of the matter thus injected into the record being wholly irrelevant or immaterial. At the January term, 1884, of said circuit court, a decree was entered overruling said demurrers, and at the October term, 1884, the cause having been matured, was submitted to the court, when, without any other judgment in the premises, a decree was entered directing a jury to be impaneled at the then *next term* of said court to try the following issues:

1st. Whether the said two deeds of 28th August, 1880, and the deed of 26th December, 1882, or either of them, were procured by misrepresentation, fraud, or deceit of B. G. Carter upon said Elizabeth O. Carter; 2d. Whether the said deeds were procured by the willful exercise of undue influence by B. G. Carter over said E. O. Carter; 3d. Whether at the date of said deeds said E. O. Carter was, or was not, incapable from weakness or unsoundness of mind of understanding the import, legal effect or operation of said deeds, or either of them. From

the decree overruling the demurrer, and the decree directing said issues, Benjamin G. Carter and Mrs. E. O. Carter applied for and obtained an appeal from one of the judges of this court.

*John M. Orr* and *Joseph Christian*, for the appellants.

*Holmes Conrad*, for the appellee.

RICHARDSON, J., having stated the case, delivered the opinion of the court.

The appellants assign for error first the action of the circuit court in overruling the demurrer. For ground of· demurrer they submit that there is nothing on the face of the bill, either in its original form or as amended, to show any right in the complainant to bring or to maintain this suit.

It is undeniably a fundamental rule that every bill in equity must clearly show on its face that the plaintiff is entitled to the relief demanded, or such an interest in the subject matter as clothes him with a right to institute and maintain a suit concerning it. 1 Danl. Chy. Pr. 314; 1. Barton's Chy. Pr. 349–350.

In this case, it is too obvious for argument that the original bill does not disclose any title or interest in the plaintiff upon which to found a right to bring or maintain this suit. The original bill seeks relief only against the deeds of 28th of August, 1880, which are filed as parts thereof. As to these it says: "Your orator will be content for the present to charge only that the two deeds of 28th August, 1880, were signed by Mrs. Carter under a mistake of fact; that they are not the deeds she intended to and thought that she was executing. As to how the alleged mistake on her part was brought about, he makes no charge at this time, and hopes that it will be unnecessary· to make it at all."

Now, one of these deeds conveys "Palser's Springs" to H. Heaton, in trust for the grantor for her life with remainder over to B. G. Carter or his children. The other conveys to B. G. Carter "Bellefield," and all the personal property of every kind, including portraits, pictures, furniture, &c., now on said tract, which may belong to the estate of Geo. Carter, deceased, and form a part of the rest and residue thereof." It will be observed that Mrs. Carter's "right, title and interest" in "Palser's Springs," which, by her deed of 6th of March, 1883, she conveyed to the complainant, the deed for which he sets up in the original bill, was only an equitable interest for her own life in "Palser's Springs." That interest she conveyed to the complainant, and it is not pretended that the defendants, or either of them, dispute his right thereto; and yet the prayer of the bill is that the deed to H. Heaton be annulled. There is no conflict or competition between that deed and the deed of March 6th, 1883—nor does the original bill claim that if the former were annulled, the grantee in the latter would be entitled to the fee-simple of "Palser's Springs."

Again, the will of the testator gave to Mrs. E. O. Carter "Bellefield," and the personalty aforesaid, and much other property constituting the residuum of his estate, to be by her given to his two sons in such proportions as she might deem proper. The deed to B. G. Carter confines the grant of personalty to such as formed part of that residuum, and does not pretend to grant any part of the personalty which, with "Oatland's," was bequeathed to the complainant. Besides, the original bill does not set up any title in the complainant to any part of the personalty conveyed by Mrs. Carter, with "Bellefield," to B. G. Carter. And yet the prayer is that the latter deed be corrected as to the portraits, &c. There can be no pretense, therefore, that the original bill was not open to demurrer.

The amended bill repeats the allegations of the original, and adds the circumstances of the interview between Mrs. E. O. Carter with her then counsel and others on the 30th and 31st of May, 1883, and the execution and delivery of the deed of 31st of May, 1883, and other things alleged to have happened since the filing of the original bill, and distinctly charges that the deeds of 28th of August, 1880, and the deed of 26th December, 1882, were executed by Mrs. E. O. Carter without her knowing their contents, and when she was incapable of making such conveyances, and that they were obtained from her by her co-defendant, B. G. Carter, by misrepresentations and undue influence. And in addition to the prayer of the original bill, it prays that the deed of 26th December, 1882, be annulled. The several deeds are made part of this bill.

As respects the deed to H. Heaton, trustee, and the deed to B. G. Carter for "Bellefield," and the personalty, &c., the amended bill adds nothing to the allegations of the original bill, and as to those deeds, it makes no better case than does the original.

It may be true that it alleges grounds on which, if established by proof, a court of equity would annul those deeds, and that of 26th of December, 1882, likewise, at the suit of Mrs. E. O. Carter; *but she has brought no suit to that end.* It may also be true that had she been dead when this suit was brought, and the complainant had asserted his claims to the property conveyed by those deeds, either as her devisee or as her heir, the court might have entertained his suit, and, upon sufficient proof, have granted him relief against those deeds. Kerr on Frauds and Mistake, p. 371. But, under any circumstances, he would have to allege expressly and distinctly his claim and title to the subject matter in controversy.

As to the deeds of August, 1880, the insufficiency of the amended bill is readily demonstrated by what has been said in regard to the original bill.

It remains to consider its sufficiency as to the deed of 26th December, 1882.

The bill avers that by her deed of 31st May, 1883, Mrs. E. O. Carter conveyed to George Carter the "Moorland" tract, *after* she had conveyed the same to his brother, B. G. Carter. But it also avers that the prior deed to B. G. Carter was made by her under a mistake of fact, when she was mentally incapable, and under the grantee's undue influence, and was procured by him by fraud, and prays to have it annulled. If it were annulled, then the later deed to the complainants would be effectual, and vest in him a good title to "Moorland." This last, and, it would seem, essential averment, the amended bill does not contain. The fact of the two competitive conveyances by the same grantor of the same property would, were the last grantee a grantee for value, undoubtedly make a proper case for equity jurisdiction, if suitable averments were made. See *Warren* v. *Dailey*, 80 Va. 512.

We are, therefore, of opinion that upon the case made by the bill the complainant was not entitled to the relief asked for, or to any relief, and that the circuit court erred in its said decree of January, 1884, in overruling the said demurrers, when the same should have been sustained, and the bill dismissed.

Here, this case would ordinarily stop, but both parties have expressed an earnest desire for an expression of opinion on the merits of the controversy, and we think it best to do so in order to put at rest this unfortunate bitter family strife, in which one brother is arrayed against another brother and the mother of both. The contest has been urged, not only with unusual acrimony, but has, unfortunately, been characterized by personal bitterness and strife even between counsel. But this court cannot be made the arena for the arbitrament of such matters. We, therefore, turn away from them to the principles which must dictate our conclusions.

The initial inquiry upon the merits is, whether the circuit court erred in directing the issues of fact raised by the pleadings to be tried and determined by a jury, instead of itself deciding the issues thus raised upon the pleadings and proofs in the record, and, as contended for the appellants, dismissing the bill with costs to the defendants.

First, then, have the defendants below, the appellants, the right to be here on appeal from the decree of the court below directing the issue? The legal discretion rests with the chancellor to direct, or to refuse to direct, an issue to be tried by a jury, but his ruling on that question is liable to be reversed by the appellate tribunal whenever the ruling impliedly involves a settlement of the principles of the cause. In the case at bar, by overruling the demurrer and directing the issue, the chancellor in effect decided that if the facts alleged be found to be true there should be a change of property from the defendant, B. G. Carter, to the complainant, George Carter. And so the principles of the cause were settled by the decree which entitles the plaintiff to appeal therefrom. *Reed* v. *Cline*, 9 Gratt. 136; *Wise* v. *Lamb*, *ib.*, 302; *Beverly* v. *Waldron*, 20 Gratt. 149, 154; *Elder* v. *Harris*, 75 Va. 68, 72; Code 1873, chap. 178, sec. 2.

Now, in what aspect is the case presented in the light of the pleadings and proofs? We have seen what the bill and amended bill was. Conceding, for the sake of the argument, that it states a case proper for relief, if upheld by sufficient proof, how then? B. G. Carter, in his separate answer, in direct response to the allegations of the bill, denies every material averment, and traverses every charge of fraudulent procurement and of undue influence on his part toward the grantor in the execution by her of the contested deeds, and of mental incapacity, and of mistake and ignorance on her part as to the contents of said deeds when she executed them.

The separate answer of H. Heaton, trustee, denies all knowledge on his part of the facts connected with the execution of the deed to him as trustee; and he disclaims any interest in the matter.

In her separate answer, Mrs. E. O. Carter says, among other things: "Respondent did heretofore make the three deeds referred to, to B. G. Carter, defendant, and they were duly recorded by said defendant, as he had plainly the right to do, and respondent hereby ratifies and confirms them, each and singular, as her voluntary acts, disposing of property which she, and she alone, had the legal and equitable right to dispose of, and the legal and equitable title to."

Respondent further states that these conveyances to defendant, B. G. Carter, were made by reason of "the desire" and purpose on her part to make as equitable and just division of her property as was in her power, she having relinquished to George Carter, complainant, many years since, her life estate in the "Oatland" estate, a very valuable property, in addition to the real estate and stocks in Baltimore, devised for her life to her by the will of the late George Carter, of "Oatland."

Respondent denies emphatically any imputation of idiotcy, imbecility, or incompetency, either in 1880 or since, and is surprised that said complainant could regard her as capable of any connivance or collusion with said defendant, B. G. Carter, as charged, and repels with disdain all the allegations involving fraud, undue influence, &c., both as to herself and said defendant, B. G. Carter.

In respect to these contested deeds, such is the answer of Mrs. E. O. Carter who, as co-defendant with one son, is sued by another son and called upon to answer under oath, as to the charater of these transactions in respect to property absolutely hers to dispose of as she saw fit. No higher testimony as to her capacity to dispose of her own could be required than is afforded in the

act of suing her and calling upon her to answer under oath, even if we concede (as we do not) that the appellee, George Carter, had the right to bring and maintain this suit. The answer speaks for itself; it is full, direct, complete and overwhelming.

Attention may be called to a circumstance attempted to be invested with some significance in connection with Mrs. Carter's answer, as evidence touching the question of her mental condition. The notary who certified her affidavit to her answer, proceeded as if he were taking the acknowledgment of a *feme covert* to a deed of conveyance—that is, by explaining the instrument and by privy examination, and certified that she fully undertood the instrument, had willingly executed it and did not wish to retract it. This signifies and illustrates only the emphasis which inexperienced officials are apt to give to their blunders. Afterwards, before another official, she made the usual affidavit, which was properly certified.

Such being the explicit and positive denials of these defendants, who are the principal ones, of every material averment of fraudulent procurement, undue influence, mistake of fact and mental incapacity, a critical examination of all the evidence adduced has been made in order to ascertain whether the complainant in the court below, the appellee here, has succeeded in overcoming the weight of these responsive denials, and in establishing his positions, *prima faciae* at least, by his proofs. If he has not succeeded so far, then the issue should not have been directed, and the bill should have been dismissed.

In *Beverley* v. *Waldron, supra,* this court said: "It seems to be the settled rule that in no case ought an issue to be ordered to enable a party to obtain evidence to make out his case; that when the allegations of the bill are positively denied by the answer, and the plaintiff fails to furnish two witnesses, or one

witness and corroborating circumstances in support of his bill, it is wrong in the chancellor to order an issue; that no issue should be ordered until the plaintiff has thrown the burden of proof on the defendant; that until the *onus* is shifted and the case rendered doubtful by the conflicting evidence of the opposing parties, the defendant cannot be deprived by the order of the court for an issue, of his right to a decision by the court on the case made by the pleadings and evidence."

Thus has the rule for the guidance of the chancellor in such cases, long been succinctly, clearly and correctly defined. There can be no difficulty in rightly applying the rule to the case in hand.    It is alleged that when Mrs. E. O. Carter signed and acknowledged the two deeds of 28th of August, 1880, and the deed of 26th of December, 1882, she was incapable of executing such conveyances; that they are not the deeds she intended to execute; that she did not know their contents when she signed them; and that they were procured from her by false representations made to her by her son and co-defendant, B. G. Carter.    We have seen how direct and emphatic her denial of each and every of these charges is, and how promptly she avouches her good faith by expressly ratifying these contested deeds.

Now, what two witnesses have testified to the contrary and in support of the bill?    Nay, what one witness and corroborating circumstances support the bill?    What one witness alone does it?    Certainly not Mrs. E. O. Carter's niece, companion and secretary, Mrs. A. G. Fitzhugh.    Not H. T. Frazier, the justice who certified her acknowledgment of the two deeds of August, 1880,    Not Townsend Frazier, the justice who certified her acknowledgment of the deed of December, 1882.    In truth, not one of the many witnesses who were examined, so testified, and the bill stands unsupported by witnesses or circumstances.

It is singularly inconsistent, yet true, that the appellee seeks to employ as evidence in support of his bill, a deed made by Mrs. E. O. Carter at a subsequent date conveying to him the same land which she had previously conveyed to B. G. Carter, and the recitals contained in the subsequent deed, and in a paper signed by her at the date of the subsequent deed, and her directions of March 9, 1883, to her then counsel to take steps to set aside the three contested deeds, and her subsequent unsworn hearsay declarations made out of court; which deed and paper, she swears, was delivered by her to counsel to be kept subject to her future orders, and which she recalled before any action was taken upon them, or, at least, before she was aware that the deed had been delivered to the appellee, George Carter. And yet more strange, he denies that she possessed the requisite mental capacity in August, 1880, and in December, 1882, but accepts a deed from her in May, 1883, and relies on her unsworn hearsay statements made when she was ill in May, 1883, to invalidate her solemn acts of previous years; yet he offers no evidence of *any improvement in her mental condition between those periods.* It is too obvious for comment that such subsequent deed could not revoke the former ones, and that her subsequent statements and recitals could not impeach those deeds, especially when taken in connection with the conspicuous fact that she stood in the court below, as she stands here, insisting on the validity of those prior deeds, and denouncing as invalid the subsequent deed. There has not been even an effort made to prove want of capacity in Mrs. Carter at any time.

The record contains absolutely no evidence that the contested deeds were made by Mrs. Carter under the undue influence of her son, B. G. Carter, but much to the contrary. Mrs. A. G. Fitzhugh, from her relations to Mrs. Carter, would have been privy to the exertion of such influence if it had existed. She

Opinion

was examined as a witness for the complainant, and what does she say? Question: "State whether or not B. G. Carter could or did influence Mrs. E. O. Carter to conform to his wishes; and if so, state anything that occurred to lead you to think so?" Answer: "I think she likes to gratify him in every way she can. If he influences her it is not in my presence."

The influence to vitiate an act must amount to force and coercion, destroying free agency. It must not be the mere desire of gratifying the wishes of another; for that would be a very strong ground in support of the act in question. It must be proved that the act was procured by this coercion, by importunity which could not be resisted, and that the act was done merely for the sake of peace, so that the motive was tantamount to force or fear. Such is the definition of "undue influence," which has always obtained in this court. *Simmerman* v. *Songer*, 29 Gratt. 9; *Parramore* v. *Taylor*, 11 Gratt. 220; *Greer* v. *Greer*, 9 Gratt. 330; Jarman on Wills, 29. It is also alleged that B. G. Carter procured the execution of the contested deeds by false representations. What the representations were the bill does not state; no witness mentions any.

Lastly, another charge is that Mrs. E. O. Carter made these deeds under a mistake of fact, supposing she was making some other conveyances instead of these. It is mere form to notice this. The whole record may be searched again and again, but it will not reveal a syllable to sustain the charge. The evidence is excessively voluminous and much of it entirely irrelevant. It would be tedious in the extreme and entirely profitless to refer to it in detail. Suffice it to say, that whilst the appellee's witnesses fail to support the material allegations of the bill, those of the appellants go very far towards sustaining the denials of the answers. And a prominent and important fact gleaned from the record is that all the witnesses concur in exhibiting respect for Mrs. E. O. Carter's strong char-

acter and unusual intelligence, which, though diminished by the physical infirmities of her great old age, had not been impaired in force of will or clearness of judgment. As executrix of her husband's will, she successfully administered his extensive estates in difficult times; and during her long widowhood she prudently managed her own large private fortune. After making equal, or at least, very considerable provisions for the appellee, George Carter, the property she saw fit to bestow upon her son, Benjamin, who had been less fortunate than his brother, George, in managing and retaining his patrimony, was her own property and absolutely at her own disposal, unfettered in any way. She gave it to him, she says in her answer, voluntarily, and she confirms the gift. And whatever incorrect, but perhaps, in a woman and a mother in dealing with her children, natural notions she may at times have entertained as to her right to change her mind and revoke the disposition she had made of her property, and to reclaim gifts already consummated by her deeds; and whatever vacillations she may have felt, and now and then evinced by her words and acts, owing to causes needless now to enquire into, in regard to the division of her property between her two sons, her only children, who living on the border had become comparatively poor by the results of the war, yet it is not to be gainsaid that the deeds to B. G. Carter are conveyances of property, which she was entitled to dispose of at her pleasure, and conveyances, which, so far as the truth can be ascertained from the record, were executed by her knowingly and freely, and having been so executed, are unimpeachable, even at her own suit, had she desired to invalidate them, and which certainly cannot be invalidated at the suit of the appellee, George Carter, on the showing made by him in the record in this cause.

We are, therefore, of opinion that the circuit court erred in directing that the issues of fact raised by the pleadings and

proofs in the cause, should be tried and determined by a jury, and in not itself deciding those issues upon said pleadings and proofs, and dismissing the complainant's bill with costs. The said decrees of January, 1884, and October of the same year must be reversed and annulled, and a decree entered here dismissing said bill with costs to the appellants.

DECREES REVERSED.